UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,　　*　　CRIMINAL NO. 05-362(DRD)
　　　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　　　*
　　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*
MIGUEL ENCARNACION-MONTERO,　*
　　　　　　　　　　　　　　　　*
　　　　Defendant.　　　　　　　*
_____

**ORDER**

Defendant, Miguel Encarnación-Montero, filed on May 22, 2006, a Motion for Suppression of Evidence, (Docket No. 26). The defendant is charged in the instant case with a two-count indictment wherein in Count One a conspiracy is charged "to seize, detain, and threaten to kill a hostage . . . a national of the Dominican Republic in order to compel, to pay a ransom of money as a condition for the release of said hostage, FCDR. All in violation of Title 18 U.S.C. §1203(a). In Count Two the defendant is also charged with "knowingly use, carry and brandish a firearm during and in relation to a crime of violence to wit: conspiracy to seize, detain, and threaten to kill a hostage in violation of 18 U.S.C. 1203 as charged in Count One of the indictment. All in violation of Title 18 U.S.C. 924(c) and 2.

Defendant, Miguel Encarnación-Montero, hereinafter referred to as "Encarnación" alleges that he was arrested while driving a black Ford Ranger Pick-up vehicle on October 6, 2005 at around 11:00 p.m. in Carolina, Puerto Rico. He alleges that was arrested on the spot; he never exited the vehicle and there was allegedly no identification by the wife of the

1

victim, Juana Cedeño. The husband Fermin Caminero, a Dominican National, had been allegedly kidnaped from his home on October 4, 2005 at around 9:00 a.m. by three individual males possing and dressed as a policeman. They stated that they were executing an arrest for drug trafficking violations. The affidavit of FBI Agent Mark G. Miller dated October 7, 2005, states that the three persons  handcuffed and seized Fermin Caminero. One of the persons was "wearing a blue hat with a police badge on it, a bullet proof vest, police pants, having a police radio, handcuffs and a pistol, being approximately six feet tall, thin, having a thin face and medium dark skin. The second man was described as having the same clothing and gear as the first and having approximately the same physical appearance. The third man was described as having the same police hat, but wearing a gray tee-shirt, light blue jeans, fair complexions, being fat and having a round face." Affidavit in Support of Search Warrant (hereinafter referred to as Affidavit.) The kidnaping was performed pursuant to the affidavit based on facts provided by the wife of the victim,  or the victim himself, by persons simulating being police officers.

Pursuant to the FBI Agent Miller's affidavit, on the same day of the kidnap, October 4, 2005, the victim's wife received a phone call at around 11:00 a.m. from a man who demanded $500,000.00 to release Juana Cedeño's husband. Several subsequent demands were made on this the first day of the kidnaping. Cedeño then decided to seek police intervention, the same date of the original telephone ransom request, and returned to her house with the police. Cedeño continued to receive multiple phone calls still demanding $500,000.00 for her husband. She continued to receive phone calls "receiving police coaching," the ransom was subsequently lowered to $150,000.00 the following day on October 5, 2005.  A police agent was able to intercept the calls directly from the Police

Station. In other subsequent phone calls the kidnaper requested cooperation as "they would kill Caminero"[1] Reiterated phone calls were then made to arrange a proper location for the money drop. No agreement had been reached by Wednesday, October 5, 2005. On October 6, 2005, the parties agreed to meet somewhere in Carolina. Arrangements were subsequently agreed for the drop of the ransom money in Carolina. The defendant was arrested after the drop, upon the "pick up of the money" by the defendant at 11:00 p.m. (Affidavit).

The defendant Encarnación alleges that both his arrest and the subsequent search of his  vehicle, via a search warrant, was without cause in violation to the Fourth Amendment since "[t]he detention of the respondent [Encarnacion-Montero] against his will constitutes a seizure of his person, and the Fourth Amendment guarantee of freedom from unreasonable searches, and seizures "in violation of the law," Cupp v. Murphy, 412 U.S. 291, 294 S. Ct. 2000 (1923). (Docket No. 26, p. 3).  Defendant Encarnacion-Montero further alleges the arrest was unreasonable "unless it is supported by probable cause" Michigan v. Summers, 452 U.S. 692, 101 S. Ct. 2587 (1981) and that since there was no probable cause the evidence obtained emanating from the arrest should be excluded,  U.S. v. Khounsavanb, 113 F.3d 279, 285 (1st Cir. 1997) (Docket No. 26, p. 4). Finally, the defendants urge that "[g]ood faith in the part of the arresting officer is not enough to arrest an individual in the absence of probable cause,"  Henry v. U.S., 361 U.S. 98, 80 S. Ct. 168 (1959).

The defendant attacks not only the probable cause of the arrest but also separately

---

[1]        Affidavit, p. 3.

the sufficiency of the search warrant under the Franks requirements alleging that the search warrant in its face is insufficient because the same lacks probable cause ("failing to establish probable cause in its face.") (Docket No. 26, p. 6.)  The defendant counsel then states referring to the search warrant without order that "[t]he Magistrate Judge must not serve merely as a rubber stamp of the police [the FBI in this case].  He must be neutral and detached in deciding whether there is sufficient cause to justify issuance of the search warrant" citing U.S. v. Ventresca, 380 U.S. 102; 85 S. Ct. 741 (1965), (Docket 26, p. 6-7).

The undersigned Judge originally denied the motion as untimely on May 23, 2005 (Docket No. 33) based on the fact that motions to suppress had been ordered to be filed by December 9, 2005 and the motion being filed in May 2006 was prima facie late. The court stated that the matter could be raised at trial. The defendant then sought reconsideration (Docket No. 38) well grounded on the fact that defendant had received a timely discovery package on November 21, 2005 but had received a second discovery package on January 3, 2006 and a third and last package on March 16, 2006. Further, the designation of evidence was not made until April 5, 2006 together with a copy of the government's affidavit in support of the search warrant. The Motion to Reconsider contained the two pronged suppression attacks, the Motion to Suppress described above. The court reconsidered, authorized the late filing and granted the United States until June 6, 2006 to Reply, (Docket No. 44).

The United States then timely  opposed the suppression of evidence on June 6, 2006 (Docket No. 45).  The United States alleges that there was probable cause to arrest the defendant Encarnación based on "the assessment of probabilities in particular factual contexts." Illinois v. Gates, 462 U.S. 213, 232, 103 S. Ct. 2317 (1983) and further the

4

matter of the arrest "must be evaluated in the light of the totality of circumstances" United

States v. Torres Maldonado, 14 F.3d 95, 105 (1st Cir. 1991).  Moreover the concept of

probable cause, the government "need not present the quantum of proof necessary to

convict" Id. at 105.  Moreover, the government "need only show that at the time of the

arrest, the facts and circumstances known to the arresting officer were sufficient to warrant

a prudent person in believing that the defendant had committed or was committing an

offense. Id. at 105. (Docket No. 45, p. 2, Opposition.)  The United States then citing

United States v. Arvizu, 534 U.S. 266, 122 S. Ct. 744 (2002) as to "unreasonable searches

and seizures" referring the court to the following citation:

> "Because the 'balance between the public interest and the individuals right
> to personal security' (citations omitted) tilts in favor of a standard less than
> probable cause in such cases, the Fourth Amendment is satisfied if the
> officer's action is supported by reasonable suspicion to believe that the
> criminal activity may be afoot." United States v. Sokolov, 490 U.S. 1, 7, 109
> S. Ct. 1581 (1989).

As to the affidavit, the United States directs the court to paragraph #8 of the FBI

Agent Affidavit in Support of the Search Warrant which states as follows:

> "On October 6, 2005, the two parties continued negotiations and agreed to
> meet somewhere in Carolina, Puerto Rico. Two police officers accompanied
> Cedeño and De Los Santos in their vehicle to bring the drop money. They
> were directed by kidnappers via cellular telephone as to where to drive to
> drop off the money. At sometime while they were on the telephone with the
> kidnapper, they observed a man in a black Ford Ranger pickup truck
> following them. The man was using a cell phone and appeared to be talking.
> They believed that this was the man talking to them on the cell phone. The
> vehicle followed them through the turns until they were told to drop the
> money on a bridge. They threw the drop money in a bag out the window and
> kept driving. At approximately 11:00 P.M. the same night, the black Ford
> Ranger stopped to pick up the money. Police vehicles in the area arrested

the man driving the vehicle on the spot."[2]

The United States alleges that the affidavit used to procure the cellular phone via search warrant is sufficient because from the affidavit it can be readily determined that since from the Black Ford Ranger cellular phone calls were made by the driver from the Ford Ranger directing the victim's wife and the unknown policemen accompanying them to drop the ransom money requested in order to seek the return the kidnaped victim. The affidavit states that the Ford Ranger followed them through turns and they were being directed by the man in the Ford Ranger "via cellular phone." They further observed a man in a black Ford Ranger following them " . . . the man was using a cell phone and appeared to be talking. They believed this was the man talking to them on the cell phone and appeared to be talking" . . . "The vehicle followed them through the turns until they were told to drop the money on the bridge"  . . . "The Ford Ranger stopped and picked up the money  . . . Police vehicles in the area arrested the man in the vehicle [the Ford Ranger]." Hence, the United States alleges  there is sufficient cause to arrest (based on the evidence provided at the hearing) and as to the challenged search warrant the affidavit (stating alone) is prima facie sufficient as to the cellular phone. Further, the defendant does not have any right to challenge under the Fourth Amendment against unlawful search and seizure because "the proponent of a Motion to Suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search and seizure." Rakas v. Illinois, 439 U.S. 128, 99 S. Ct. 421 (1978) and "[b]efore embarking

---

[2]     The court has received no evidence as to evidence to be used by the United States allegedly from the location where the victim was located. The court reserves judgment on that matter.

upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectancy of privacy in the area searched." United States v. Aguirre, 839 F.2d 854 (1st Cir. 1981) (Docket No. 45 p. 4).  Finally, the United States states that "[t]he vehicle which defendant was driving at the time of his arrest was seized upon probable cause to believe that it was and had been used in the commission of a crime."  Further, the vehicle in which defendant followed the vehicle carrying the "ransom money" and in which defendant [subsequently] placed the "ransom money" was not even registered to defendant's name. The defendant is, hence,  not the owner of the vehicle he used during the events of October 6, 2005. Further, defendant is not the registered owner of the cellular phone he used to demand the ransom money. (Docket No. 45, p. 6, Opposition to Suppression.)  The United States therefore concludes that defendant lacks standing and that there was probable cause for the arrest, the seizure of the car and the subsequent search warrant of the car.

## I. THE PROBABLE CAUSE TO ARREST CHALLENGE

The court is of the opinion that the matter as to probable cause for the arrest of defendant Encarnación is not close at all. The facts that developed from the kidnaping occurring on October 4, 2005 until the date of defendant's arrest clearly warrant an arrest of the defendant Encarnación. The court explains.

An officer arrests a citizen upon reasonable belief that there is probable cause that he or she committed a crime or is about to commit a crime. United States v. Cortez, 449 U.S. 411, 417, 418, 101 S. Ct. 690, 694-95 (1981).  Probable cause to carry out an arrest without a judicial warrant will depend upon "whether, at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers'] knowledge and/or which they

7

had reasonably trustworthy information were sufficient to warrant a prudent man in believing [the person arrested] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964).  However, it is not necessary that an officer have personal knowledge of all the items of information which, taken together, constitutes probable cause of an arrest without a warrant; it is enough that "the collective knowledge and information of all of the officers involved establishes probable cause." United State v. Rose, 541 F.2d 750, 756 (8th Cir. 1976), cert. denied, 430 U.S. 908, 97 S.Ct. 1178 (1977).

Police intervention rises to the level of an arrest only when a reasonable man in the subject position would have understood his situation to be tantamount to an "arrest" in light of the totality of circumstances.  Berkemer v. McCarty, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151-3152 (1984). "Totality of circumstances" essentially means that a case by case determination is required by the courts. Accordingly, "whether police activity is reasonable in any particular context depends on the facts which are uniform to that incident."  United States v. Kimball, 25 F. 3d 1, 6 (1st Cir. 1994). Again a case by case is required.

There is no "per se" rule under the Fourth Amendment context.  The proper inquiry "necessitates a consideration of all the circumstances surrounding the encounter." United States v. Drayton, 536 U.S. 194, 201, 122 S. Ct. 2105, 2111 (2002). The court harbors no doubt that the defendant was in fact arrested on the night of October 6, 2005 and that there was probable cause. However, the court emphasizes that it is the combined knowledge of the Police officers that determine probable cause and that "it is not necessary that an officer have personal knowledge" because it is "all items of information . . . taken together [which] constitute probable cause for arrest." Beck v. Ohio, 379 U.S.

8

at 79, 85 S. Ct. at 225.

### I. The Facts as to Probable Cause

The court proceeds to analyze the facts as testified by the two Police officers who participated in the arrest. The two officers who testified at the Suppression Hearing were the two officers that dealt with the defendant Encarnación on the night of October 6, 2005. Officer José Rosa López (hereinafter referred to as Rosa López) testified on July 7, 2006 and officer Luis F. Calderón Pérez (hereinafter referred to as Calderón-Pérez) on July 12, 2006. No other witness for either side testified. The "totality of circumstances" is therefore circumscribed to these two officers.

Officer Rosa López was the officer who was assigned to retrieve from the police station the phone calls of the kidnapper directed to the victim's wife, Juana Cedeño. He investigated the kidnaping being a policeman of ten (10) years experience assigned to bank robberies and kidnaping cases having made in his career over two-hundred arrests. He was advised that Juana Cedeño's husband Fermin Caminero was kidnaped by three individuals, posing as policeman stating to have an arrest warrant. One of the person was half uniformed and carrying a weapon, police badge, bullet proof vest, police radio, handcuffs and a pistol. The first abductor was described as tall, thin and medium dark skin. The second abductor had similar description of clothes but carried no weapon. The third person had a police hat but no uniform. The victim, Fermin Caminero, was allegedly arrested and handcuffed based on a local narcotic charge violation.

Several hours later on October 4, 2005, the wife Mrs. Cedeño began receiving phone calls from the kidnaper. She decided to go to the Police where José Rosa López was assigned to her case and began acting that afternoon, directly from the Police station

simulating to be, to the kidnaper caller, "the cousin,"  helping the victim's wife to recuperate her husband. The wife was also accompanied by Lourdes de los Santos, sister-in-law, both of Dominican extraction.

Juana Cedeño received calls from a person that sounded of Dominican accent and a mature person. Since the phone calls were being made to a cellular phone the number appeared imaged in the cellular phone screen used by Juana Cedeño, intercepted by "Rosa López." The phone number was 787 324-6900. In one of the subsequent calls made on October 5, 2005, the amount was negotiated down to $150,000.00 from the original amount requested of $500,000.00. The parties failed, however, to reach an agreement on this date as to a place to deliver the money. Finally, on October 6, 2005, an agreement was reached to deliver the $150,000.00 in cash in a black plastic bag as requested by the kidnaper as a condition to the safe return of Fermin Camionero.  The policeman Rosa Lopez acting as cousin received from three to five cellular phone calls from the kidnaper.

He was ordered to deliver the money the night of October 6, 2005.  He was directed to go to Avenida Campo Rico, a major vehicle artery running from 65th Infantry Street in Rio Piedras to the Diego Expressway in Carolina. The agent, "Rosa López," used an unmarked car, a green Dodge Caravan minivan; he was assigned to drive the car and speak to the kidnapers on the cell phone. Also with the agent was Juana Cedeño, the victim's wife, in the passenger front seat, Lourdes de los Santos, (sister-in-law) in a back seat, and another agent José Alvarado lying in the floor of the back seat with a radio to communicate with other officers assigned in the area. Other unmarked cars were in the area together with an arresting Swat team.  Two cars were assigned for the security of the minivan. Amongst the other agents assigned was Agent Luis F. Calderón Pérez in an unmarked red Toyota car,

10

and another agent called José Ayala Resto, hereinafter "Ayala Resto," who was the driver in the same vehicle.

The victim's wife, Ms. Lourdes de los Santos, José Rosa Lopez, the "cousin and a hidden policeman Alvarado left for Campo Rico Ave.  The two policemen, the victim's wife and her relative were riding the green minivan (not a police identified vehicle). Several cellular phones with the kidnaper took place.  The kidnaper asked for the  identity of the persons in the car; he was advised three persons were riding in the car (the "cousin," Mrs. Juana Cedeño and Mrs. Lourdes de los Santos).   The identity of policeman Alvarado also riding in the case was not revealed to the cellular caller. An operational security plan had been prepared at the Police Headquarters to deliver the money, rescue the victim and apprehend and arrest the kidnapers.  At least two vehicles were assigned as part of the security to the green Dodge Caravan minivan together with a Swat team to arrest the kidnapers.

As the minivan reached the Kentucky Fried Chicken area close to the area of Carolina next to the bowling ally, the kidnaper called and asked policeman Rosa López, where they were. The cousin, (an undercover policeman, Rosa López), stated that he had driven almost all the Campo Rico Ave. and stated he was at the level of the Kentucky Fried Chicken. The caller requested the driver, Rosa López, to go back on Campo Rico Avenue. The person calling the minivan through the cell phone had the same voice as the person whom Rosa López spoke to before simulating being the "cousin" of Juana Cedeño as to the negotiation of the ransom money for the life of Fermin Caminero. The policeman Rosa López spoked in a low tone to policeman Alvarado to alert the units that he was returning back to Rio Piedras on the same Campo Rico Avenue he had been traveling  The minivan

11

made a "u" turn at the Kentucky Fried Chicken intersection. A while later, another cell phone was made by the same person to the minivan asking for their location. He was advised that the green minivan was in front of Pueblo Supermarket. The cell caller continued on the cell line. By that time it was around 11:00 to 11:30 p.m.  The minivan then reached the Taco Maker light level of Campo Rico Ave., the caller stated he still could not see him (the policeman Rosa López was then alerted that the person was near). The caller remained on line. The policeman ("the cousin") Rosa López was advised to continue further.  Rosa López was then extremely alert as to all vehicles and people in the area. The caller again requested to know the location of the green minivan; he was informed by the policeman that he had crossed the intersection and the light of the Taco Maker and left the light behind. The caller said "he could see me" (meaning the minivan).  Rosa López was further alerted.  Rosa López then saw a Ford Ranger Black pick-up parked on top of the sidewalk. The outside lights of the car were off. The policeman paid close attention to the Ford Ranger. (The vehicle was parked in the same direction as the minivan was moving.) There was an occupant on the left hand off the auto (the driver seat); the occupant had his left hand close to his ear with his body turned to the back looking at the minivan. The caller then stated that "he was looking at you" [the driver of the minivan].  As the minivan passed the Ford Ranger, Rosa López noticed that the occupant of the Ford Ranger rotated his body following the movement of the minivan. The caller stated to the minivan to continue. The policeman Rosa López driving the minivan advised fellow hidden policeman Alvarado what was happening to alert all units. (Rosa López pulled the cellular from himself and spoke to Alvarado so that the caller could not listen to the conversation.)  Rosa López then saw the car leave the sidewalk, turn on the headlights and follow the green minivan in a

12

very slow speed. Thereafter the caller requested that the minivan make a right hand turn at the next street, Street No. 148 of Campo Rico Ave.  Rosa López purposely passed the street by a short distance and stopped. The caller stated "you passed the street."  Rosa López stated "I am scared; I am doing this as a favor." The policeman then stated over the cell that he was going to make the drop right there. The caller said no, "this is almost over; turn right as I told you." Rosa López then backed the car and made the turn as requested. The Black Ford Ranger had stopped (75 to 100 feet of the minivan). The green minivan was then in Street 148th, 4th Extension of Country Club. Again Alvarado, the other policeman on the floor of the green Minivan, is informed of what is occurring for relay information to the police units in support of the operation. Rosa López continued on Street 148th, no other car was on the street and then the Ford Ranger entered 148th Street. The caller then requested that the minivan continue ahead and a little after the first corner, on the right within 148th Street,  the caller stated to drop the money "right there."  Rosa López testified that the only vehicle he could see behind was the Ford Ranger. Rosa López asked if he was sure that he wanted the money dropped in that place; the caller confirmed. Rosa López  then testified that he was sure that he was talking to the kidnaper in the Ford Ranger. He mentioned several reasonable factors:

(1) The telephone in the ear of the occupant of the Ford Ranger at the same time he was talking to him and that fact occurred immediately after the caller stated that he could see him (referring to the green Minivan).

(2) The caller located in the passenger seat of the black Pick-up Ford Ranger turning in the same direction as the minivan.

(3) Prior before the caller could not see the green minivan.

(4) The car was the only car in the area.

(5) The Ford Ranger turned on the lights as soon as the minivan passed and followed the minivan.

(6) The Ford Ranger followed the minivan into Street 148th after Rosa López was told to enter 148th Street.

(7) The Ford Ranger stopped behind as the green Minivan was requested to make the drop "right there."

Rosa López  turned off the phone and asked Juana Cedeño to make the drop of the $150,000.00 in a black plastic bag and informed Alvarado of what was simultaneously occurring.  Rosa López  advised Alvarado that the person who was talking on the cell phone was the person in the Ford Ranger proving the instructions as to drop off. Rosa López requested Alvarado to request from other support that the person in the Ford Ranger be intervened.

After the drop off the car continued on 148th Street until there was an elbow turning to the right in the road, after the elbow the green Minivan continued and made a "u" turn on the street to come out on the same 148th Street to Campo Rico Avenue. Here the minivan at the elbow stated above suddenly found a minivan dark colored. A lady left off the minivan, left the car in reverse and ran away from the dark colored minivan. The vehicle left unattended impacted the front of the green minivan driven by the policeman. The policeman could then see at the same time policeman Calderón (Luis Calderón Pérez) and Ayala (José Ayala Resto) making the intervention to the Black Ford Ranger at the place where the money was dropped off.  Policeman José Alvarado got off the green Minivan and headed toward the area of the intervention being made of the driver in the

14

Pick-up Ford Ranger. The green van exited the area as he had two civilians in the car under his control and was responsible for their safety.

In cross examination policeman Rosa López stated that all interventions of the cell phone 787 324-6900 were made by him from the Police Headquarters in Roosevelt Avenue. He saw the Ford Ranger enter 148th Street. No car entered between the green minivan he was driving and the Ford Ranger. The drop off was made in an area where there were no other business establishments. The area of the drop off consisted of the sides and rears of residential houses; but no front of residential houses were around the drop off area. When he took the elbow within 148th Street after the drop of the money, for the first time after originally observing in the sidewalk the black Ford Ranger,  he could no longer see the pick-up black Ford Ranger. Policeman Rosa López stated he did not investigate the dark minivan that hit his green minivan at the elbow of 148th Street as he later was exiting the area. Finally, although the Ford Ranger was the only vehicle parked in the Campo Rico Avenue surroundings when he first saw a said vehicle, other vehicles passed him in the area.

The second and last witness to the Suppression Hearing testified on July 12, 2006. He is a policeman by the name of Luis F. Calderón Pérez (hereinafter called "Calderón"). He also worked in the Bank Robberies and Kidnaping Section of the Police of Puerto Rico. He participated in more than one hundred arrests. He was familiar with the kidnap investigation involving defendant Miguel Encarnación-Montero, "Encarnación-Montero." He described  his physical characteristics. He understood the kidnaping occurred essentially as narrated by the first policeman José Rosa López. He did not directly participate in the beginnings of the investigation; he was assigned to the case in the afternoon of October

15

6, 2005 to provide back up support to the rescue operation. A work plan was designed to rescue the person who had been kidnaped and to apprehend the kidnapers. He was assigned together with a partner at 9:00 p.m. of October 6, 2005 to a confidential unmarked vehicle, a red Toyota with confidential licence plates. Calderón's partner was Agent José Ayala Resto, hereinafter referred to as "Ayala Resto." The instructions were to be in the  look out for a green forest colored Caravan S.U.V. where Agent Rosa and Agent Alvarado were riding together with the wife of the victim. The vehicle was carrying $150,000.00 in ransom money for the life of Fermin Caminero.

At 11:00 p.m. Calderón was in the confidential vehicle in Campo Rico Avenue, he had radio communication with Agent Alvarado, who was in the minivan incognito, (as part of the operational plan originally designed). Calderón was then advised the areas that the green minivan was driving by.  Instructions were being provided by the kidnaper to the green Minivan. At one moment Pérez detected the green Caravan vehicle. A black colored Ford Ranger followed them driving very slowly. Calderón continued ahead and passed them. Calderón made a "u" turn after passing them and parked on the "reverse" [opposite] side of Campo Rico Avenue that Calderón was driving when he passed the green Minivan and the black Pick-up Ford Ranger.  The minivan was going from Carolina to Rio Piedras on Campo Rico Avenue. He parked on the reverse [opposite] side of Campo Rico Avenue. After examining the photographs in evidence the court concludes that reverse meant that he parked on the opposite side of Campo Rico Avenue in front of the Copy Du Services business being able to see through the front of their car the approaching Minivan and Ford Ranger coming to Pérez on the other side of the Campo Rico Avenue. (See Ex. F depicting Campo Rico Avenue, the stop sign is at Street 148. There is a small paved bridge over the

16

small creek on Campo Rico Avenue at 148th Street.)  See also Exhibit G depicting 148th Street the Stop Sign, the Black Building and the corner a block away within 148th Street where the drop off was made.  See likewise Exhibit "E" depicting 148th Street showing a black building and an in depth view of 148th Street with a barely legible sign in ink demonstrating the route of the cars to the drop off point of the money – as testified by Pérez.) Pérez now in the opposite side of Campo Rico Avenue testified he could see facing the vehicles  the green Caravan followed by the Black Ford Ranger. (See illustration No. 1, drawn by witness Pérez as to where he was located in the red Toyota car in relation to Street 148.) The Illustration appears to be numbered Street #410 as the last number did not copy clearly from to court's black board to the copying instrument. The witness stated that "I saw the [green] Caravan stop briefly, go back a little and turn to the right into 418 [St.]."  Pérez stated that he knew what the Caravan was simultaneously doing since "I was being informed over the radio . . . instructions were given to turn into the street."  The instructions were being provided by "the person who was talking to Rosa on the phone."[3] The witness stated that he had a (photocopy) business on his back and he could see everything developing in front of him. (See Ex. F "Copy Du Service).  "The black Pick-up, as [well as] the Caravan, kept on going ahead, it approached slowly the corner of 418 also."  The black Pick-up was "tailgating" the green Minivan; [the green Minivan] opened and someone made a movement like depositing a package on the ground on the side walk . . . the ransom money . . .  a black plastic bag."  "The black Ranger stopped behind the Minivan as the money was being dropped. He stopped 30 to 25 feet behind." After the

---

[3]      The quotations provided herein in this order are from a rough draft provided by the court reporter enabling the court to verify its notes from the hearing dates.

Minivan dropped the black bag, the minivan continued on, Officer Pérez was advised through the radio that the drop off had been made; the pick-up approached very slowly the area of the package.  At that same time Pérez, with Ayala driving, approached slowly in the red Toyota the area of the package where the black Pick-up was approaching the package. The driver door of the black Ranger opened and Pérez saw "Miguel Encarnación go out, went by the front of the [black] Pick-up" and pick up the black bag (Encarnación-Montero was then identified by Pérez in open court.) [The Pick-up model has only one front seat– there are no rear seats].  After the pick up of the black bag,  Encarnación-Montero then headed for the driver door through the front of the black Ford Ranger.  Ayala Resto was driving, stopped at an angle in 148th  Street to the left of the Pick-up and Pérez and Ayala Resto arrested Encarnación-Montero. The description of the arrest was the following:

> Agent Ayala got out of the vehicle, I got out of the vehicle. We had our identifications which we pulled out, as policeman, taking all due precautions with the firearm in our hands, and we told this person to stop, telling him that he was under arrest, to which he reacted like upset, when we proceeded to arrest him we had to– we engaged in a little struggle with the gentlemen, and between agent Ayala and myself we were able to put him on the ground.
>
> We had to make a little force to handcuff him, and once more we stated why he was being arrested.

> The grounds for the arrest were described in the following terms:

> Q: Now agent, why did you arrest him?
> A: We arrested him because agent Ayala as well as myself, had grounds to believe that this person was committing an offense. Since there was a kidnaped person for whom money was being requested in exchange for his life, and that at approximately 11:00 p.m. that vehicle that he had been driving was following the green minivan where the money was, and at the same time got out of the vehicle, picked up the money, and placed it inside the pickup that he was driving.

> So that is what leads me to believe that he is suspicious of committing that offense.
> Q: Now, agent, 071206-rough-Encarnación, besides your personal observations, did you rely on any other information?

A: What I saw, and what I was being told by the agent on the radio.
Q: So your answer would be that you relied on other information?
A: That can, what the agent was saying to me on the radio.


After the arrest the scene was kept under custody. The black bag can be seen in a photograph plain view in the only seat of the black Pick-up on the right-hand side of the seat. The cellular phone can be seen also plain view to the left of the black bag near the driver side of the seat. (See Ex. 1, photograph taken of the seat of the Pick-up cabin (only one seat in the vehicle) as originally appeared at the time of the arrest.)

In cross examination witness Calderón stated that other officers were in the area but he did not know their location. He was, however, on radio communications with the other officers in the area. He further stated that he reached the vehicle driven by defendant before the green Minivan returned to the area. He insisted that he was parked in Campo Rico facing where the Minivan and the black Ford Ranger were coming from in the opposite side of Campo Rico Avenue. "There was a business establishment that was close [Copy Du Service]. I put the car on reverse, that is how I was able to see or face the front." The court reasonably infers  that the driver Ayala traveling with Calderón made a "u" turn at 148th Street, put his car on reverse, and parked his car with the photocopy business at this back. See photo Ex. "F."  See also illustration No. 1 of the court drawn by the witness; markings on the back of the blackboard photo. The photocopy constitutes an illustration by Calderón of the place where Calderon's unmarked police car parked on the opposite side of Campo Rico Avenue after making the "u" turn as the Minivan and the black Ford Ranger later are approaching. Calderón  is hence looking at them coming in his direction, the green minivan and the black Ford Ranger, in front of him; the transcript as   the

19

illustration was being drawn clearly states that the street in question is 418 and not Street 410 as appeared unclear in the photograph of the diagram. (See also illustration No. 2 which was also prepared by witness Calderón as he was testifying showing the positions of the cars at the moment of arrest.)  Calderón stated that only the Minivan and the black Ford Ranger Pick-up entered Street No. 418. Other policemen arrived after the arrest.

The witness stated that after the drop off by the green Minivan he saw the defendant get out of the black Ford Ranger Pick-up, move through the front of the vehicle, pick up the bag and then go to the passenger side of the car,  open the door, and drop the bag inside the car after opening the passenger door. The vehicle has "only one driver door, only one passenger door." Calderón and Ayala were the only officers making the arrest of defendants; the vehicle black Pick-up Ranger remained "on" while the arrest was made. Calderón was parked on opposite side of the 418th Street parked only one minute to a minute and a half before he could see in front of him the green Minivan and the black Ford Ranger. The defense produced photographs marked Ex. D., E., F. (prior thereto A, B, C, were admitted). They are all photographs of the area surrounding 418th Street. Exhibit "F" is 418th Street,  where the stop sign is located. (To the right is the bridge and the creek on 418th Street.)  Calderón is parked on the parking area of Copy Du Service. At Exhibit "D" the blue building on the left is the corner of 148th Street and Campo Rico Avenue. That is the vision from in front of the Copy Du Service where Calderón and Ayala were parked. Road 418 can be seen to the left. Calderón explained that at 418th  Street and Campo Rico Avenue the vehicle "stopped briefly then backed up a little and went in." Referring to Exhibit "F" he was "on the other street after the bridge" "parallel to 418th  Street." As to photograph "E" there is a vehicle in the background of 418th Street.  The vehicle can be seen also in

Exhibit "G" also depicting 418th Street. The court adds that it is clear from Exhibit "G" that 418th Street on the left has no houses since the entire left side borders the creek. To the right of 418th Street there is a commercial building and afterwards the sides of dwelling houses– no front areas. Exhibit "G" also contains a corner street within 418th Street between two houses. (The sides of two houses.) The witness Calderón states that Rosa Lopez "stopped right there, at the entrance of that side street." There is a cyclone fence prolonging the entire left of 418th Street bordering the river as seen in photographs "G."

On redirect, Calderón stated that when he observed the defendant place the ransom money inside the Pick-up " . . . I was already, I had entered the Street," meaning 148th Street and was able to observe as he picked up the money, as I was approaching, as I was almost at the corner of the first corner of the side street."

Q: So when defendant picked up the money you were exactly where?
A: I had already entered 148th, slowly approaching the first corner of the side street. Calderón was inside 148th Street around the middle of the first street prior to the corner, correct, and from there I was able to observe as the door opened, and I saw Miguel Encarnación go by the front of the pick up, pick up the bag, toss it . . . In the passenger seat and went to the front  . . .  by the front of the pick up Ranger.

The arrest was then made by agents Calderón Pérez and Ayala Resto.

The salient facts of the case are therefore as follows:

(1)    Fermin Caminero, a dominican national was kidnaped from his home on October 4, 2005 at around 9:00 a.m.

(2)    The kidnapers simulated to be policeman performing a drug arrest. Two of the kidnapers had police uniforms, one of which had a bullet proof vest, handcuffs, and a pistol.

(3)    That same morning the victim's wife, Juana Cedeño, received a phone call at around 11:00 a.m. seeking a ransom of $500,000.00. She sought help from the Police that same date. The ransom continued to be $500,000.00 for that day. The phone calls were intercepted by the police from the Police Headquaters and Ms. Cedeño received coaching from the police.

21

(4)     The ransom money was lowered to $150,000.00. Police Agent José Rosa López was assigned to the case on October 4, 2005 and coached Juana Cedenó and simulating to be the cousin of Ms. Cedeño. José Ayala Rosa also coached Juana Cedeño and received in the police station the intercepted calls.

(5)     The phone receiving the phone calls from the kidnaper was a cellular phone. The receiving cellular phone imaged in its screen the calling number as 787 324-6900.

(6)     On October 6, 2005, the kidnaper and the wife together with the "cousin," police Agent Ayala Rosa agreed to deliver the $150,000.00 ransom to the kidnaper. The "cousin" had attended to around three to five phone calls from the kidnaper, a male who had a voice with Dominican accent and a mature person.

(7)     The cousin agreed with the kidnaper to deliver the money the night of October 6, 2005 in a black bag. He was instructed by the cell caller to go to Campo Rico Avenue. Policeman Rosa López proceeded to Campo Rico Avenue in a Dodge Caravan green minivan unmarked police car (a rented car). He had with him Ms. Juana Cedeño in the front passenger seat; Lourdes de los Santos, sister-in-law in the back seat. Also in the back seat, as part of the police operational security plan to rescue the victim and arrest the kidnaper[s], was police Agent José Alvarado lying in the back seat floor. Alvarado had a radio and was to communicate the movement of the Dodge Caravan green minivan to the other units assigned, including a Swat team and at least two other vehicles.

(8)     The kidnaper requested over the cell phoneRosa López, "the cousin," the description of the vehicle delivering the money and the identity of the persons in the vehicle. The kidnaper also requested to know the current location of the vehicle moving from Rio Piedras to Carolina on Campo Rico Avenue.

(9)     The green Minivan with policeman Rosa López reached the Kentucky Chicken area in Campo Rico Avenue next to the bowling alley as the kidnaper called again requesting location from policeman Rosa López. The kidnaper then requested Rosa López to go back on Campo Rico Avenue toward Rio Piedras. Policeman Rosa López identified the voice as that of the person whom he spoke to before previously relating to the negotiation of the ransom money and the delivery thereof. Policeman Rosa López alerted policeman Alvarado in a low tone that he was returning to Rio Piedras on Campo Rico Avenue. Policeman José Rosa López then made a "u" turn on Campo Rico Avenue and Kentucky Fried Chicken intersection.

(10)    A few minutes later the cell caller, calls again the green Minivan, the cellular phone of Juana Cedeño, and is answered again by undercover policeman Rosa López. The caller asks for the location of the vehicle. He is advised that they were in front of Pueblo Supermarkets (on Campo Rico Avenue). The cell caller continued on line. It was then now between 11:00 to 11:30 p.m. The minivan continued and reached the Taco Maker level of Campo Rico Avenue. The cell caller said he still could not see them. (This expression alerted Rosa López that the caller was near.) The cell caller remained on line and told Rosa López to continue. Again the caller request location; the undercover policeman states he has now crossed the Taco Maker intersection. The cell caller said "he could see me"– (statement of Rosa López as to the caller). Rosa López is further alerted to look for vehicles. Rosa López then sees a black Ford Pick-up Ranger parked totally within the sidewalk to his right. The lights were off. The Ford Ranger was parked in the same direction as the Minivan was moving. The undercover policeman, the "cousin," of Juana Cedeño, saw a person in the Ford Ranger's drivers seat, the left-hand seat; the occupant had his left hand on his left ear with his body turned to the back looking at the Minivan. The cell caller stated over the phone "he was looking at you" [the driver of the Minivan].  As the driver passed the minivan, his body rotated following the movement of the Minivan. The caller stated to the minivan to continue. Alvarado, who was riding in the floor of the Minivan also an undercover agent, was advised by Rosa López what was occurring to alert all units. The lights of the Ford Ranger were then turned on, he got off the sidewalk and followed the green Minivan in a very slow speed. The caller then requested the Minivan to turn right at the next street, 148th Street of Campo Rico Avenue. Rosa López purposely passed the street by a few yards. Rosa López was admonished that he passed the street. He said he was nervous, was doing a favor, and wanted to drop off the money there. The cell caller said no, and said "this is almost over; turn right as I told you." Rosa López  backed the Minivan and made the turn as requested. Rosa López again alerted Agent Alvarado. Rosa López continued on 148th Street, no other car entered after him, and then the Ford Ranger entered 148th Street and followed the green Minivan about seventy-five to one hundred feet behind. The caller then stated to make the drop off "right there." The green Minivan had just passed an intersection of another street on the right side within 148th Street. He alerted again Alvarado. The policeman driving the Minivan looked at the rear via mirror ". . .the only thing I saw was the black Ford Ranger . . . " Rosa López asked if he was sure it was "the place where he wanted to drop, make the drop there, and as he was looking at me and he said "yes."

The chosen place can be seen at Exhibit "G" the location of 148th Street can be seen from Campo Rico Avenue. The entire left-hand side of the street has a cyclone fence bordering a creek and the right-hand side has the side of a business and the side of a two-story house in its first block.

Then there is an intersection on the right-hand side. After an intersection there is another house whose front is facing the side street of 148th Street and whose side faces 148th Street. The drop off was made immediately after the intersection of the first street to the right within 148th Street. See illustration, Court Ex. 2, drawn by the arresting officer Calderón Pérez. Juana Cedeño got off the car and made the drop of "she got off the vehicle, and put the bag down, while I stated to Alvarado to get in touch with the other units so they would intervene the Ford Ranger." The green minivan then continued on 148th Street, there was an elbow to the right, after the elbow the green Minivan made a "u" turn and returned back on 148th Street. As the Minivan left 148th Street, on the elbow previously passed, another minivan, dark colored, blocked his free exit access, a lady exited the vehicle and ran away, she left the vehicle in reverse and said vehicle impacted the green Minivan. He saw, after making the elbow, Agents Calderón and Ayala Resto making the intervention on the black Ford Ranger. Agent Alvarado exited the green Minivan to help.

(11)   Agent Calderón Pérez and Ayala Resto were part of the operational plan. They were in an unmarked police car, a Red Toyota, they had been keep informed of what was going on through the radio by Agent Alvarado. They were traveling on Campo Rico Avenue behind the green Minivan and the Ford Ranger. The agents passed the two vehicles as they were returning in Campo Rico Avenue from Carolina to Rio Piedras. The agents made a "u" turn at 148th Street where a bridge was located. Agent Ayala Resto was the driver; Agent Calderón Pérez was the passenger. Agent Calderón Pérez testified in the Suppression Hearing as the last witness. They had received previously instructions to be looking out for the green Minivan. After making a "u" turn in 148th Street at the level of the bridge. Ayala Resto placed the car in reverse and parked on the opposite side with the rear of the car on the parking of Copy Du Service and the front of the car looking at the incoming Minivan and Ford Ranger. See photograph Ex. F. Calderón and Ayala saw the green Minivan stop beyond 148th Street with the Ford Ranger a short distance behind. Later the green Minivan reverses and enters 148th Street followed by the black Ford Ranger. Pérez stated at the hearing "I saw the Caravan stop briefly, go back a little, and turn to the right in 148th [St.]." Pérez stated that he knew what was occurring "I was being informed over the radio . . . instructions were given to turn into the Street [148[th] St.]. The instructions were being provided by "the person who was talking to Rosa on the phone."

Once the green Minivan and the black Ford Ranger enter 148th Street, the black Ford Ranger was "tailgating" the green Minivan. The green Minivan opened and someone made a movement and deposited a package on the ground on the sidewalk (later clarified to be Juana Cedeño). At that time Calderón stated "the black Ranger stopped behind the Minivan as the money was being dropped. He stopped 30 to 25 feet behind." The radio

communicated that the drop had been made. Pérez, with Ayala driving, moved from Campo Rico Avenue opposite 148th Street into 148th Street and saw the driver door of the black Ford Ranger open, the driver got off the vehicle and saw "Miguel Encarnación got out went by the front of the [black] Pick-up. He saw the driver pick up "the black bag and deposit the same in the front seat on the passenger side." After that the driver went through the front of the vehicle to the driver side. The driver of the vehicle was then arrested by Calderón Pérez and Ayala Resto who had seen him exit the black Ford Ranger, pick up the money and place it in the passenger side of the vehicle which only has one seat, a cabin as described by Calderón Pérez.

ANALYSIS

I. Probable Cause to Arrest

The facts in this case, as described above, the only facts that the court received in evidence show that defendant Encarnación-Montero was caught **in flagrante delicto**[4] immediately after the ransom money was picked up by him in front of the  the arresting agents.

Prior thereto, Encarnación-Montero had negotiated for a ransom over the cellular phone with police Agent José Rosa López who simulated being a "cousin" of Juana Cedeño, the kidnaped victim's wife. Rosa Lopez identified the voice of the cell caller providing instructions to him at Campo Rico Avenue the night of the arrest as the same person who talked to him several times negotiating the ransom money and the delivery thereof.

Mr. Encarnación was the driver of the black Pick-up Ford Ranger who was parked with the lights off on the sidewalk of Campo Rico Avenue and had said he could see the green Minivan. He was seen having an object on his left side of the face near his ear and

---

[4]     "In the very act of committing a crime or other wrong, red-handed." Blacks Law Dictionary, 7th Ed. 1999.

who turned his body as the green Minivan passed the parked black Ford Ranger. The black Ford Ranger then turned on the outside lights and followed the green Minivan. The cellular caller, defendant Encarnación-Montero, gave instructions to make a right on 148th Street. Rosa Lopez purposely passed 148th Street by a few yards and wanted to make the drop off on Campo Rico Avenue (next to the bridge on 148th Street and Campo Rico Avenue, see Ex. F and G).  The cellular caller insisted on the green Minivan making a right on 148th Street. The black Ford Ranger was behind the green Minivan. Rosa López driving the green minivan accepted, reversed the green Minivan and entered 148th Street off Campo Rico Avenue. The black Ford Ranger followed. Shortly thereafter an order is provided to make the drop off immediately after the green Minivan passes an intersection within 148th Street, (see Ex. G., first intersection on the right.) The black Ford Ranger is 30 to 25 feet behind. The drop off is made by Juana Cedeño exiting the green minivan through the right side passenger door. The money is deposited in the sidewalk, the green minivan continues on 148th  Street. Shortly thereafter, defendant Encarnacion-Montero moves his car forward and exits the black Ford Ranger Pick-up from the driver's seat, walks through the front of the vehicle, picks up the money and places the same on the passenger side of the vehicle. He returns through the front of the vehicle and is arrested by Agents Calderón and Ayala Resto, who were being notified of all events as they occurred by Agent Alvarado's radio communications, as he was hidden in the floor of the green Minivan advising all units in the operational plan the facts as they were occurring.

Under the above stated factual scenario, the court harbors no doubts that there was probable cause for the arrest. An officer may arrest a citizen only upon the reasonable

belief that there is probable cause about to commit a crime. United States v. Cortez, 449 U.S. 411, 417-418, 101 S. Ct. 690-694-695. Probable cause to carry out an arrest without a judicial warrant will depend upon "whether, at the moment of the arrest was made . . . the facts and circumstances within [the arresting officers'] knowledge and/or which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing [the person arrested] had committed or was committing an offense. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964). However, the court stresses, **it is not necessary that an officer have personal knowledge of all items of information which taken together, constitutes probable cause of an arrest warrant; it is enough that "the collective knowledge and information of all officers involved establishes probable cause."** United States v. Rose, 541 F.2d at 756. Expressed in other terms it is the pooled knowledge of officers Rosa López and Calderón Pérez which establish the "totality of circumstances" for the arrest. Rosa Lopez negotiated the ransom, was directed to Campo Rico Avenue from Carolina to Rio Piedras, was turned back at the intersection of Kentucky Fried Chicken and after the Taco Maker intersection was advised that "he could see me." Rosa Lopez recognized the voice of the cell caller as the person who negotiated with him. He saw a black Ranger parked within a sidewalk in his same direction at around 11:00 p.m., he passed the vehicle and saw a person in the driver seat with his left hand in his ear turning his body following Rosa Lopez's car. The Ford Ranger left the sidewalk, turned on the lights, and followed the green Minivan;  a short while later, the cell caller provided an order to the green Minivan conductor, undercover policeman Rosa López, to turn right on the next street, Street 148 of Campo Rico Avenue. Rosa López

deliberately passed the street, the black Ford Ranger still on his back. The cell caller did not accept to drop the money on Campo Rico Avenue a few yards passed the street (there was a bridge there on Campo Rico Avenue over a creek, se photos Ex. F and G). The Minivan was ordered to enter 148th Street. The caller had remained on the cell phone since he was advised that the Minivan was at the Taco Maker intersection of Campo Rico Avenue, including when the caller said he could see the vehicle and twice ordering the green Minivan's driver to enter 148th Street. The black Ford Ranger entered 148th Street immediately after and "tailgating" the green minivan. The caller remained on the cell phone until he ordered the Minivan to drop off the money immediately after the first intersection to the right within 148th Street. Then the money was dropped off by the victim's husband after she exited the Minivan through the passenger right door of the Minivan. According to Calderón Pérez , the Ford Ranger was then twenty-five (25) to thirty (30) feet in back of the Minivan. The Minivan continued after the drop off on 148th Street. The black Ford Ranger's driver's door opened and defendant, the driver of the black Ford Ranger, went through the front side of said vehicle, picked up the black bag money ransom and placed it on the passenger side.

The defendant returned through the front and was arrested by officers Calderón and Ayala Resto who observed as they approached defendant Miguel Encarnación-Montero pick up the ransom money and place it on the passenger side. The collective facts observed by Agents Rosa Lopez and Calderón Pérez, all occurring on the public streets and avenues of Rio Piedras and Carolina, clearly in their totality are "trustworthy sufficient to warrant prudent man in believing that [Encarnación-Montero] had committed or was committing an offense. Beck v. Ohio, 379 U.S. at 91. The court stresses that once a valid

arrest is made seizures of items in plain view are justified.  <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 465 (1971), 91 S. Ct. 2022.  The court further emphasizes that the vehicle was on the street, the black bag containing the ransom money and the cellular phone potentially used to direct the green Minivan were both clearly in "plain view" in the cabin of the black Ford Ranger Pick-up. (See Ex. 1 of the Government– The Front Cabin Seat of the Black Ford Ranger containing on the extreme right the black bag with the ransom money and to the left, near the driver side, the cellular phone, both in plain view.)  The court notes that a search of the vehicle for the money, the cell phone and a weapon was fully justified. First the original kidnaping was performed using a weapon and the defendant was at least an aider and an abettor in negotiating the ransom money and the delivery and drop off the ransom money. It was reasonable to conclude that the cell phone was used at least in directing the green Minivan to the drop off point. The cellular phone potentially constitutes evidence to confirm the use of the phone on the night of October 6, 2006, to call Juana Cedeño's cellular phone to drop the money at 148th Street. A search for weapons was also fully justified since the original kidnaping was performed with a weapon. See generally <u>Washington v. Chrisman</u>, 455 U.S. 1 (1982) (plain view seizure of balloon filled with narcotics valid because officers were lawfully executing an arrest warrant (similar to a probable cause finding).  See also <u>Texas v. Brown</u>, 460 U.S. 730, 731, 103 S. Ct. 1535, 1537 (1983).

> "The plain view doctrine provides grounds for a warrantless seizure of a suspicious item when the officers access to the item **has some prior justification under the Fourth Amendment.** This rule merely reflects an application of the Fourth Amendment's control requirement of reasonableness to the law governing seizures of property. Here the officers' initial stop of respondent's vehicle was valid, and his actions in shining the flashlight into the car and changing his position to see what was inside did

not violate any Fourth Amendment rights. (Emphasis ours) (Plurality opinion.)

Hence, the court finds probable cause to arrest the defendant and no Fourth Amendment bar exists to the subsequent search because the facts all occurred in the streets and there was a prior justification to look for the ransom money black bag and the cellular phone.

## II. The Alleges Franks Deficiency as to the Search

## and Warrant for the Cellular Phone.

The court technically does not have to address the legality of the search warrant under Franks v. Delaware, 438 U.S. 154, 98 S. CT. 2674 (1978), since there is a separate and independent cause for the warrantless search of the vehicle. The black bag containing the ransom money and the questioned cellular phone are obviously of incriminating nature in the instant kidnaping case as the cellular phone was used to aid in the drop off the ransom money.  See Minnesota v. Dickerson, 508 U.S. 366, 375, 113 S. Ct. 2130, 2136-2137, (1993) (incriminating nature of an object is immediately apparent if the police have probable cause to believe an object in plain view is contraband); United States v. Perrotta, 289 F.3d 155, 167 (1st Cir. 2002) (incriminating nature of brass knuckles and billy clubs immediately apparent because officers had reason to believe weapons were being used to collect debts.)  United States v. Gamble, 388 F.3d 74, 77 (2nd Cir. 2004)(incriminating nature of ammunition immediately apparent because officers had probable cause to believe defendant was involved in drug dealing and guns and ammunition are frequently connected with such crimes.)

Notwithstanding the court addresses the matter of the alleged insufficiency of the affidavit warranting the search of the vehicle as to the cellular phone pursuant to

compliance with <u>Franks v. Delaware</u>, 438 U.S. 171-172, 98 S. Ct. 2684-2685. A few preliminary matters fatally bar the request. First, the car where the cellular phone was found and the cellular phone are both not registered in the name of the defendant; hence the defendant lacks standing to raise the matter on suppression. <u>United States v. Romaine</u>, 393 F.3d 63, 60 (1ˢᵗ Cir. 2004) (standing is required as part of the threshold in a Motion to Suppress.)   Further, there must be "a reasonable expectancy to privacy in the area searched and in relation to the items searched.  <u>United States v. Aguirre</u>, 839 F. 2d 854, 856 (1ˢᵗ Cir. 1988); <u>United States v. Romaine</u>, Id.; <u>Rakas v. Illinois</u>, 439 U.S. 128, 138-140, 99 S. Ct. 421 (1978). The facts as to the delivery of the ransom money and the calls in the cellular phone all occurred in the streets of Rio Piedras and/or Carolina; hence defendant can not claim either "an expectation of privacy" nor "standing" hence his claim to suppress also falls prior to reaching the merits, falling far short of reaching the <u>Franks</u> **"standing" threshold.**

But defendant also fails as to other substantive <u>Franks</u> threshold requirements expressed at 438 U.S. 171-172; 98 S. Ct. 2684-2685:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these

requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

The initial threshold requires, because there is a "presumption of validity" in a search warrant, a showing of "deliberate falsehood" or "reckless disregard of the truth" and an "offer of proof must be made." Further, the portion of the warrant affidavit that is claimed to be false "must be identified" and "they should be accomplished by a statement of supporting reasons." The First Circuit Court of Appeals in the recent case of <u>United States v. F. Tzannos</u>, ___F.3d___, 2006 WL 2407378, August 22, 2006 (1st Cir. 2006) set forth the standard for the court to grant a hearing as follows:

> A. Suppression Order.  "There is . . . a presumption of validity with respect to the affidavit supporting the search warrant." <u>Franks</u>, 438 U.S. at 171. For this reason, a defendant must meet a high bar even to get a Franks hearing in the first place. In order for a warrant to be voided and the fruits of the search excluded, the defendant must meet an even more exacting standard: he must (1) show that the affiant in fact made a false statement knowingly and intentionally, or with reckless disregard for the truth, (2) make this showing by a preponderance of the evidence, and (3) show in addition that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.

The standard is sequential if one of the first two elements are not reached the third becomes inconsequential. Defendant fails in both.

Defendant's Motion to Suppress, Docket No. 26, of May 22, 2006 does not state **any** of the required above described elements. The court should summarily **DENY** the request. The reason provided is that "examination of the affidavit in support of the search warrants for the vehicle and the mobile telephone reveal that the only factual circumstance

that supports the arrest, search and seizure was that "the defendant was driving a vehicle and the mobile telephone reveal that the only factual circumstance that support the arrest, search and seizure was that the defendant was driving a vehicle while apparently talking over the telephone and that he stopped the car in the area where the ransom money had been dropped. The defendant did not make any attempts to retrieve the money nor to grab the bag where the money was hidden."

The defendant questions the issuance of the warrant based on the FBI Affidavit, (D. 29 and 29-2), as to the cellular phone. The petitioner allegation is that the affidavit is insufficient. The court reiterates that the allegation fails to comply with United States v. Tzannos, ___F.3d___ (August 22, 2006). Notwithstanding, the court disagrees with the proposition made by defendant as to insufficiency.

The court stresses that the object of the suppression is the "cellular phone."[5] Pursuant to the affidavit at §4 a person was kidnaped by three men announcing they were from the police. One wore a bullet proof vest, a police radio, handcuff, and a pistol. The other also had police clothing. A third only wore a police hat. Cedeño, the victim's wife, received a phone call the same date of the kidnaping, §5 of the affidavit. Several more calls were made prior to Ms. Cedeño deciding to visit the police. She returns to her house and she continues to receive phone calls. The police coaches Ms. Cedeño (§6). Ms. Cedeño receives multiple further phone calls and the ransom is dropped from $500,000.00 to $150,000.00, (see §5 and §7).

---

[5] The defendant also questions the search of the locality where the victim was located. No evidence has been proffered at the hearing to suppress as to any item retrieved from the locality. Hence, the court does not cross that bridge at this time.

In paragraph §8 the affidavit clearly states that the kidnapers "via cellular phone" directed Cedeño, De los Santos, and two policemen to deliver the ransom money. . ." "A man in a black Ford Ranger Pick-up was following them. The man was using a cell phone and appeared to be talking. They believed that this was the man talking to them on the cell phone. The vehicle followed them through the turns until they were told to drop the money on the bridge.[6]  The black Ford Ranger stopped to pick up the money (this information is not false) the Police arrested the man driving the vehicle."  Finally, §9 states that the arrested person was "Miguel Encarnación-Montero who was in possession of a Nokia cellular phone."

The court harbors no doubt that these facts are pellucidly sufficient to warrant a search warrant directed to the cellular phone since the cellular phone constitutes incriminatory evidence as to the defendant calling via a cell phone on October 6, 2005, the cell phone of the victim's car directing the drop of the ransom money. (See §8 and §9 of the Affidavit in Support of the Search Warrant.)

The suppression as to probable cause to arrest is **DENIED** as well as the separate

---

[6]     That information is incorrect because the money was dropped around forty yards from the bridge within 148th Street. The agent attempted to drop the money near the bridge but the kidnaper insisted on a place with less traffic. But the information is not "knowingly and intentionally false." For the affidavit purposes of the warrant to seize the cell phone, the location of the drop is immaterial. What is material for search warrant purpose is that there was evidence provided in the affidavit that the phone calls were being made from the Ford Ranger Pick Up.

suppression as to the insufficiency of the search warrant pursuant to <u>Franks v. Delaware</u>,

438 U.S. at 171-172,  98 S. Ct. at  2684-2685.

       **IT IS SO ORDERED.**

At San Juan, Puerto Rico, this 5th day of September 2006.

                         s/ Daniel R. Domínguez
                         **DANIEL R. DOMINGUEZ**
                         **U.S. DISTRICT JUDGE**